1  Eric Landau (State Bar No. 138849)
   elandau@jonesday.com
2  Travis Biffar (State Bar No. 217593)
   tbiffar@jonesday.com
3  JONES DAY
   3161 Michelson Drive, Suite 800
4  Irvine, CA 92612
   Telephone: (949) 851-3939
5  Facsimile: (949) 553-7539

6  John C. Tang (State Bar No. 212371)
   jctang@jonesday.com
7  JONES DAY
   555 California Street, 26th Floor
8  San Francisco, CA 94104
   Telephone: (415) 626-3939
9  Facsimile: (415) 875-5700

10  Attorneys for defendants

11

12              **UNITED STATES DISTRICT COURT**

13              **CENTRAL DISTRICT OF CALIFORNIA**

14

15  Robert Masters, Individually And On      CASE NO. 8:14-cv-00053-CJC-RNB
    Behalf Of All Others Similarly
16  Situated,                                **DEFENDANTS' MEMORANDUM
                                             OF POINTS AND AUTHORITIES
17          Plaintiff,                       IN OPPOSITION TO
                                             PLAINTIFF'S MOTION FOR
18          v.                               PRELIMINARY INJUNCTION**

19  Avanir Pharmaceuticals, Inc., Keith A    Date:   February 10, 2014
    Katkin, Craig A. Wheeler, Corinne H.     Time:   1:30 p.m.
20  Nevinny, Dennis G. Podlesak, Hans E.     Place:  Courtroom 9B
    Bishop, David J. Mazzo, and Scott M.             [Honorable Cormac J. Carney]
21  Whitcup,
                                             Complaint Filed:  January 14, 2014
22          Defendants.

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ........................................................................... 1

II.  BACKGROUND ............................................................................ 2

   A.  THE PARTIES ...................................................................... 2

   B.  AVANIR'S 2005 STOCK INCENTIVE PLAN .......................... 2

   C.  PROPOSAL 4:  THE PROPOSED 2014 PLAN ........................ 3

   D.  THE LITIGATION AND PLAINTIFF'S REQUEST FOR
      INJUNCTION ........................................................................ 3

III.  ARGUMENT ................................................................................ 4

   A.  STANDARD FOR ISSUANCE OF AN INJUNCTION ................... 4

   B.  PLAINTIFF FAILS TO ESTABLISH IRREPARABLE HARM ........ 4

      1.  The Propriety Of An Injunction Must Be Assessed On A
          Case-By-Case Basis .................................................... 4

      2.  A "Yes" Vote On Proposal 4 May Be Nullified ................... 5

   C.  PLAINTIFF IS UNLIKELY TO PREVAIL ON THE MERITS ........ 6

      1.  Plaintiff Misinterprets Section 162(m) ............................ 6

      2.  Plaintiff Fails To Establish That Any Of The Details He
          Wants To Disclose Are Material ............................... 12

      3.  Much Of The Information Sought By Plaintiff Is Already
          Disclosed In The Proxy Or In The Public Domain ................. 15

          (A)  Shareholder Dilution ......................................... 15

          (B)  "Overhang" ...................................................... 16

          (C)  "Burn Rate" ..................................................... 16

          (D)  Criteria For Issuing Stock Appreciation Rights And
              Restricted Stock Units ..................................... 18

      4.  Plaintiff's Additional Metrics .................................... 18

          (A)  "Burn Rate" Comparison ..................................... 18

          (B)  Testing Of CEO Pay-For-Performance Relative To
              Returns .......................................................... 19

          (C)  Shareholder Value Transfer Analysis ..................... 19

      5.  Professor Daines Explains Why The Details Plaintiff
          Seeks Are Immaterial ............................................. 19

      6.  Courts Have Consistently Refused To Require  Additional
          Disclosures Relating To Compensation Plans .................. 22

   D.  THE BALANCE OF EQUITIES AND THE PUBLIC
      INTEREST WEIGH IN DEFENDANT'S FAVOR ......................... 24

IV.  BOND REQUIREMENT ................................................................. 25

V.  CONCLUSION ............................................................................. 25

i

# **TABLE OF AUTHORITIES**

**Page**

**CASES**

*Abrons v. Maree,*
   911 A.2d 805 (Del. Ch. 2006) ..................................................................... 14, 15

*Anselmo v. Mull,*
   No. Civ. 2:12-1422 WBS EFB, 2012 WL 5304799 (E.D. Cal. Oct. 25,
   2012) ..................................................................................................................... 4

*Calamore v. Juniper Networks, Inc.,*
   No. C07-01772, 2007 U.S. Dist. LEXIS 30653 (N.D. Cal. Apr. 12, 2007) ........ 6

*Calleros v. FSI Int'l, Inc.,*
   892 F. Supp. 2d 1163 (D. Minn. 2012) .................................................................. 5

*Data Probe Acquisition Corp. v. Datatab, Inc.,*
   722 F.2d 1 (2d Cir. 1983) ..................................................................................... 15, 17

*Deborah G. Mallow IRA SEP Investment Plan v. McClendon,*
   Case No. CIV-12-436-M, 2012 U.S. Dist. LEXIS 78479 (W.D. Okla.
   June 6, 2012).................................................................................................. 5, 6

*Dias v. Purches,*
   Civ. A. No. 7199VCG, 2012 WL 4503174 (Del. Ch. Oct. 1, 2012).................. 13

*eBay Inc. v. MercExchange, LLC,*
   547 U.S. 388, 164 L. Ed. 2d 641, 126 S. Ct. 1837 (2006) ................................... 4

*Freedman v. Adams,*
   C.A. No. 4199-VCN, 2012 Del. Ch. LEXIS 74 (Del. Ch. Mar. 30, 2012),
   *aff'd,* 58 A.3d 414 (Del. 2013) ........................................................... 6, 11, 13, 14

*Global Horizons, Inc. v. U.S Dept. of Labor,*
   510 F.3d 1054 (9th Cir. 2007) ............................................................................... 4

*Gordon v. Symantec,*
   No. 1-12-CV-231541, 2013 WL 657791 (Cal. Super. Ct. Jan. 22, 2013) ... 17, 22

*Greenhouse v. MCG Capital Grp.,*
   392 F.3d 650 (4th Cir. 2004)............................................................................... 15

ii

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
　174 F.3d 411 (4th Cir. 1999)...................................................................25

*In re Checkfree Corp. S'holder Litig.*,
　Civ. A. No. 3193-CC, 2007 Del. Ch. LEXIS 148 (Del. Ch. Nov. 1, 2007).......17

*In re Gen. Motors (Hughes) S'holder Litig.*,
　Civ. A. No. 20269, 2005 Del. Ch. LEXIS 65 (Del. Ch. May 4, 2005),
　*aff'd*, 897 A.2d 162 (Del. 2006) .............................................................15

*In re Micromet, Inc. S'holders Litig.*,
　Civ. A. No. 7197-VCP, 2012 Del. Ch. LEXIS 41 (Del. Ch. Feb. 29, 2012) .....15

*In re Siliconix Inc., S'holders Litig.*,
　Civ. A. No. 18700, 2001 Del. Ch. LEXIS 83 (Del. Ch. June 19, 2001)............12

*Knee v. Brocade Commc'ns Sys. Inc.*,
　Case No. 1-12-CV-220249 (Cal. Super. Ct. Apr. 10, 2012) ......................22, 23

*Mancuso v. The Clorox Co.*,
　No. RG12-65163, 2012 WL 5874640 (Cal. Super. Ct. Nov. 13, 2012) ......17, 22

*Mancuso v. Clorox Co.*,
　No. RG12-651653 (Cal. Super. Ct. Aug. 21, 2013) (Statement of Decision
　(Tentative)) .........................................................................................12, 13, 23

*Mancuso v. Clorox Co.*,
　No. RG12-651653 (Cal. Super. Ct. Sept. 24, 2013).........................................13

*Mazurek v. Armstrong*,
　520 U.S. 968, 138 L. Ed. 2d 162, 117 S. Ct. 1865 (1997) (*per curiam*)..............4

*Meyer v. Alco Health Servs. Corp.*,
　No. Civ. A. 11213, 1991 Del. Ch. LEXIS 10 (Del. Ch. Jan. 17, 1991)............15

*MONY Group Inc. v. Highfields Capital Management, L.P.*,
　368 F.3d 138 (2d Cir. 2004) ..................................................................5

*Morrison v. Hain Celestial Grp.*,
　No. 602074/2012 (N.Y. Super. Ct. Nov. 14, 2012) .........................................22

*Noble v. AAR Corp.*,
　No. 1:12-CV-07973 (N.D. Ill. Oct. 9, 2012)....................................................22

iii

*Pfeffer v. Redstone*,
  965 A.2d 676 (Del. 2009)................................................................... 12

*Ret. Sys. v. Cont'l Res., Inc.*,
  886 F. Supp. 2d 1255 (W.D. Okla. 2012) ...........................................5

*Ret. Sys. v. Corti*,
  954 A.2d 319 (Del. Ch. 2008) .......................................................... 13

*Rice v. Ultratech*,
  No. 1-12-CV-226520 (Cal. Super. Ct. Jul. 16, 2012) ........................22

*Ryan v. Lyondell Chem. Co.*,
  No. 3176-VCN, 2008 WL 2923427 (Del. Ch. July 29, 2008), *rev'd on other grounds*, 970 A.2d 235 (Del. 2009) ...........................................19

*Skeen v. Jo-Ann Stores, Inc.*,
  Civ. A. No. 16836, 1999 Del. Ch. LEXIS 193 (Del. Ch. Sept. 27, 1999),
  *aff'd*, 750 A.2d 1170 (Del. 2000) ...................................................... 14

*Solomon v. Armstrong*,
  747 A.2d 1098 (Del. Ch. 1999) ......................................................... 19

*Strategic Diversity, Inc. v. Alchemix Corp.*,
  666 F.3d 1197 (9th Cir. 2012)........................................................... 13

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 ........................................................................ 12, 13, 14

*Winter v. Nat'l Res. Def. Council Inc.*,
  555 U.S. 7, 172 L. Ed. 2d 249, 129 S. Ct. 365 (2008) ........................4

**STATUTES**

26 U.S. Code § 162(m) ......................................................................passim

15 U.S. Code § 78n.................................................................... 4, 5, 12

**OTHER AUTHORITIES**

26 C.F.R. § 1.162-27 ................................................................................7

26 C.F.R. § 1.162-27(e)(2)(vi) ................................................................8

26 C.F.R. § 1.162-27(e)(4)(i) ..................................................................7

iv

26 C.F.R. § 1.162-27(e)(4)(vi) .......................................................................... 8

Fed. R. Civ. Proc. 23.1 ..................................................................................... 7

Fed. R. Civ. Proc. 65(c) .................................................................................. 25

Cases, Faruqi & Faruqi LLP, http://www.faruqilaw.com/cases/allCases (last
    visited Feb. 5, 2014).  ........................................................................... 22

Glass Lewis & Co., http://www.glasslewis.com/about-glass-lewis/ (last
    visited Feb 5. 2014) .............................................................................. 21

Institutional Shareholder Services,
    http://www.issgovernance.com/proxy/advisory (last visited Feb. 5, 2014) ....... 21

Mary Jo White, Chairwoman, SEC, Remarks at Nat's Ass'n of Corp.
    Directors Leadership Conference 2013: The Path Forward on Disclosure
    (Oct. 13, 2013), (available at http://www.sec.gov/News/Speech/Detail/
    Speech/1370539878806) ......................................................................... 15

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION

## I.    INTRODUCTION

This is one of a series of seemingly obligatory attacks on executive compensation during proxy season.  This putative class action focuses on defendant Avanir Pharmaceuticals, Inc.'s ("Avanir") new equity compensation plan ("2014 Plan") that is up for shareholder approval at the company's annual meeting on February 12, 2014.  Plaintiff criticizes the description of the 2014 Plan in Avanir's 2014 proxy statement ("2014 Proxy" or "Proxy"), which is contained in Proposal 4 to the Proxy.  Then, by threatening an injunction immediately before the annual meeting, plaintiff hopes that the company will make a few immaterial changes to the Proxy and handsomely compensate his attorney, rather than risk a delay in the vote.  However, there is no problem with the Proxy's disclosures and the company will not be shaken down.  Avanir respectfully asks the Court to allow all of the shareholders to vote at the upcoming meeting and let the majority decide the fate of the 2014 Plan, and not just a single shareholder, who owns less than one one-hundredth of a percent of Avanir's 152 million outstanding shares.

Plaintiff cannot make the required showing for emergency injunctive relief. First and foremost, Avanir's description of the 2014 Plan is detailed, complete, and fully complies with all legal requirements.  Further, enjoining the vote would confuse Avanir's shareholders by flooding them with useless information, jeopardize Avanir's operations, and serve no meaningful purpose.  Pertinent here, plaintiff stands alone in finding problems with the Proxy's disclosures.  No other shareholders have come forward to join him in this lawsuit, and of the votes cast thus far, upwards of 90% have *supported* the 2014 Plan.  Moreover, the country's two principal proxy advisory services, Institutional Shareholder Services ("ISS") and Glass Lewis & Co. ("Glass Lewis"), have supported the 2014 Plan and have not objected to the disclosures.  To assist the Court, Avanir has submitted the expert opinion of Stanford Law Professor Robert Daines, who believes the proposed disclosures to be immaterial and of no use to investors.

1

## II.    BACKGROUND

### A.    THE PARTIES

Avanir, a corporation organized under the laws of Delaware and headquartered in Aliso Viejo, is a pharmaceutical company that acquires, develops, and commercializes therapeutic products for the treatment of central nervous system disorders.  Class Action Complaint ("Compl."), Dkt No. 1, Jan. 14, 2014, ¶ 11.  The company currently has approximately 152 million shares of common stock outstanding.  *Id.* ¶ 22.  The individual defendants include all of the members of Avanir's board of directors (the "Board") as of the date the complaint was filed.  *Id.* ¶¶ 12-18.   Plaintiff alleges that he is an Avanir shareholder.  *Id.* ¶ 10.  He claims to own 0.007% of Avanir's stock.  *See* Certification of Named Plaintiff Robert Masters, Dkt. No. 5, Jan. 17, 2014, ¶ 4.

### B.    AVANIR'S 2005 STOCK INCENTIVE PLAN

Like many publicly-held companies, Avanir maintains equity incentive plans to attract and retain qualified employees, and to align their interests with those of the company's shareholders.  According to the Proxy, Avanir's equity awards are important to incentivize its employees to remain with the company, to motivate them to help attain corporate objectives, and to align employees' interests with those of stockholders.  Declaration of Christine G. Ocampo in Support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction ("Ocampo Decl."), filed herewith, Ex. H [2014 Proxy] at 12.

At present, Avanir has one existing plan from which equity compensation may be granted, the 2005 Equity Incentive Plan ("2005 Plan").  2014 Proxy at 12.  The 2005 Plan, which Avanir's shareholders approved in March 2005, *see* 2014 Proxy at 13, allows Avanir to grant non-statutory stock options, stock appreciation rights, stock awards, and cash-based incentive awards to employees, directors, and consultants.  Each year, Avanir files with the SEC an annual report on Form 10-K, disclosing the number of shares issued under the 2005 Plan.  Declaration of Robert

2

M. Daines in Support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction ("Daines Decl."), filed herewith, ¶ 22 tbl. 1.

As of December 13, 2013, there remained 191,126 shares available for issuance under the 2005 Plan.  2014 Proxy at 13.  In each of fiscal years 2011, 2012, and 2013, Avanir issued approximately 3.2 million shares as equity awards. *Id.*  The Proxy states that the company currently does not have a sufficient number of remaining shares available under the 2005 Plan to compensate its employees in line with past practice. Ocampo Decl. ¶ 24.

### C.   PROPOSAL 4:  THE PROPOSED 2014 PLAN

On December 30, 2013, Avanir filed and distributed its Proxy, which seeks shareholder approval of five proposals at the company's annual meeting on February 12, 2014.  2014 Proxy at 2.  Proposal 4, the only proposal at issue here, would approve the 2014 Plan, and would increase the number of shares that Avanir may issue in the future by 17 million shares.  *Id.* at 13.  According to Avanir, if Proposal 4 is approved, the shares available under the 2014 Plan will last approximately four years.  *Id.*  Pertinent here, if the 2014 Plan is not approved and Avanir is unable to issue future equity awards, it may have to increase the cash component of employees' compensation.  Not only will this fail to align employee interests with those of the shareholders, but it also would require that the company allocate its crucial cash reserves to its compensation programs to remain competitive in compensating its employees while seeking to reach profitability.

### D.   THE LITIGATION AND PLAINTIFF'S REQUEST FOR INJUNCTION

On January 7, 2014, plaintiff's counsel sent a letter to Avanir demanding that the company amend its Proxy to include additional disclosures relating to Proposal 4 and threatening to enjoin the shareholder vote if Avanir did not capitulate to his demands.  Plaintiff filed this case on January 14, 2014, and six days later moved for a preliminary injunction.  *See* Plaintiff's Memorandum in Support of Motion for

3

Preliminary Injunction ("Pl. Mem."), Dkt. No. 6, Jan. 20, 2014.

## III.   ARGUMENT

### A.   STANDARD FOR ISSUANCE OF AN INJUNCTION

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972, 138 L. Ed. 2d 162, 117 S. Ct. 1865, 1867 (1997) (*per curiam*) (internal quotations omitted; emphasis in original).  A party seeking a preliminary injunction must clearly demonstrate each of the following: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest.  Where the party seeking a preliminary injunction fails to satisfy any of these factors, the preliminary injunction must be denied.[1]  *Winter v. Nat'l Res. Def. Council Inc.*, 555 U.S. 7, 20, 172 L. Ed. 2d 249, 129 S. Ct. 365, 374 (2008).  Irreparable harm and likelihood of success are weighed on a sliding scale; as the probability of success decreases, the moving party must demonstrate a higher degree of irreparable harm. *Global Horizons, Inc. v. U.S. Dept. of Labor*, 510 F.3d 1054, 1057-58 (9th Cir. 2007).

### B.   PLAINTIFF FAILS TO ESTABLISH IRREPARABLE HARM

#### 1.   The Propriety Of An Injunction Must Be Assessed On A Case-By-Case Basis

The Supreme Court has emphasized that categorical rules for issuing injunctions are inappropriate, *see eBay Inc. v. MercExchange, LLC*, 547 U.S. 388,

---

[1] Plaintiff argues that "Delaware substantive law applies to the underlying legal requirements of establishing an entitlement to injunctive relief," but "it appears that the standard for the issuance of a preliminary injunction is similar, if not the same, under Delaware and California law." Pl. Mem. at 9 n.3.  This is incorrect.  Federal law governs the standard plaintiff must meet to secure an injunction from a federal court. *Anselmo v. Mull*, No. Civ. 2:12-1422 WBS EFB, 2012 WL 5304799, at *5-6 (E.D. Cal. Oct. 25, 2012).  Delaware law governs whether plaintiff has shown a likelihood of success on his state-law breach of fiduciary duty claim. *See id.* Federal law also governs whether he has shown a likelihood of success on his Section 14(a) claim. *Id.*  California law is irrelevant to this analysis.

4

393-94, 164 L. Ed. 2d 641, 647, 126 S. Ct. 1837, 1840-41 (2006), and courts have rejected plaintiff's attempt to equate a looming shareholder vote with irreparable harm.[2] Two recent decisions have held that, *even in the merger context*, a misleading proxy does not give rise necessarily to a showing of irreparable harm. *Calleros v. FSI Int'l, Inc.*, 892 F. Supp. 2d 1163, 1172-73 (D. Minn. 2012) (denying preliminary injunction for, *inter alia*, failure to show irreparable harm); *Louisiana Mun. Police Emps.' Ret. Sys. v. Cont'l Res., Inc.*, 886 F. Supp. 2d 1255, 1267-68 (W.D. Okla. 2012) (same). Plaintiff must show, but has not shown, that the shareholder vote at issue *in this case* will cause irreparable harm.

### 2. A "Yes" Vote On Proposal 4 May Be Nullified

If the shareholder vote proceeds on February 12 and the Court later determines that the Proxy was so deficient as to invalidate the vote, irreparable harm still does not result. The vote can be nullified and the company can issue another proxy statement and schedule another vote on the incentive compensation plan.

*Deborah G. Mallow IRA SEP Investment Plan v. McClendon*, Case No. CIV-12-436-M, 2012 U.S. Dist. LEXIS 78479, at *12 (W.D. Okla. June 6, 2012), is instructive. There, the plaintiff sought to enjoin a shareholder vote on, *inter alia*, a new incentive compensation plan. In denying injunctive relief for failure to demonstrate irreparable harm, the court explained:

> Plaintiffs are not attempting to enjoin a merger or other corporate activity which would require the Court to "unscramble the eggs" if preliminary injunctive relief were erroneously withheld. As set forth above, the voting items at issue do not involve complex business transactions and if Plaintiffs ultimately demonstrate proxy

---

[2] *MONY Group Inc. v. Highfields Capital Management, L.P.*, 368 F.3d 138 (2d Cir. 2004), on which plaintiff relies as an example of a court affirming an injunction in a Section 14(a) case (Pl. Mem. at 16), specifically declined to adopt the *per se* rule for injunctions in cases such as the one that plaintiff appears to advocate here. 368 F.3d at 147. For reference, 15 U.S. Code § 78n ("Section 14(a)") is attached hereto as Appendix B.

5

violations, the Court can void the shareholders' vote on the voting items related to that material information and order that those voting items be resubmitted to the shareholders.

*Id.* This rationale applies equally to this case.[3]

## C. PLAINTIFF IS UNLIKELY TO PREVAIL ON THE MERITS

### 1. Plaintiff Misinterprets Section 162(m)[4]

Plaintiff alleges: (i) that the Proxy fails to disclose that the 2005 Plan is not in compliance with Section 162(m); (ii) that Proposal 4 is defective because it falsely represents to shareholders that approval of Proposal 4 is necessary for Avanir to continue benefitting from Section 162(m); (iii) that the Board fails to disclose any tax liability incurred as a result of the expiration of "shareholder approval" status for purposes of Section 162(m); (iv) that the Proxy fails to disclose why Avanir failed to seek re-approval of the performance goals under the 2005 Plan in 2011, 2012, or 2013; and (v) that the Proxy fails to state whether any performance awards paid to named executive officers under the 2005 Plan were tax deductible under Section 162(m). Plaintiff misconstrues both the facts and applicable law.

As an initial matter, plaintiff mischaracterizes Section 162(m) as a legal requirement. In truth, it is a permissive tax provision that allows Avanir to structure its compensation programs if it needs to reduce its tax liability. This argument improperly assumes that Avanir is required to issue tax deductible equity awards to its executives. To the contrary, Delaware law *does not require* a corporation to minimize its taxes. *Freedman v. Adams*, C.A. No. 4199-VCN, 2012 Del. Ch. LEXIS 74, at *44-45 (Del. Ch. Mar. 30, 2012), *aff'd*, 58 A.3d 414 (Del.

---

[3] Nor would plaintiff suffer irreparable harm if his holdings are temporarily diluted between a successful shareholder vote and the date on which this Court ultimately decides whether the vote must be invalidated for proxy defects. Money damages may compensate for a dilution of shares. *See Calamore v. Juniper Networks, Inc.*, No. C07-01772, 2007 U.S. Dist. LEXIS 30653, at *5 n.2 (N.D. Cal. Apr. 12, 2007) (dilution would not constitute irreparable harm, as it "would be remediable by money damages").

[4] For reference, 26 U.S. Code § 162(m) is attached hereto as Appendix A.

6

2013) ("[Plaintiff] contends that the Board had a duty to adopt a § 162(m) plan under its purported fiduciary duty to minimize taxes.  Because the Court concludes there is no general fiduciary duty to minimize taxes, this argument fails.").[5]

Plaintiff also misstates by omission the requirements imposed under Section 162(m) for corporations that elect to use the permissive tax provision.  Under 26 U.S.C. § 162(m), a publicly-traded corporation is generally limited to deducting $1 million in compensation paid to certain executives[6] ("covered executives") in a tax year.  I.R.S. Notice 2007-49, 2007-1 C.B. 1429.  Compensation payable to a covered executive solely upon the attainment of one or more performance goals is not subject to the $1 million limitation, provided that, *inter alia*, the performance goals are determined by a compensation committee and shareholders approve the material terms under which the performance compensation will be paid.[7]  26 U.S.C. § 162(m)(4)(C) (2011).  For purposes of the foregoing, the "material terms" that must be approved by a corporation's shareholders include: (i) the employees eligible to receive the compensation; (ii) a description of the business criteria on which the performance goal is based; and (iii) either the maximum amount of compensation that could be paid to any employee or the formula used to calculate the amount of compensation to be paid to the employee if the performance goal is attained.  Treas. Reg. § 1.162-27(e)(4)(i); 26 C.F.R. § 1.162-27(e)(4)(i).[8]  Once

[5] Moreover, plaintiff's argument that the company has failed to take advantage of a tax-minimizing opportunity alleges harm, if any, to the company, and not to plaintiff.  Such a claim would necessarily have to have been brought as a derivative action and comply with the requirements of Fed. R. Civ. P. 23.1, which plaintiff has failed to do.

[6] Generally, the company's CEO and three highest compensated employees as of the end of a tax year, excluding the CEO and chief financial officer.  *See* I.R.S. Notice 2007-49, 2007-1 C.B. 1429.  A copy of I.R.S. Notice 2007-49 is attached as Exhibit B to the Declaration of Travis Biffar In Support of Defendants' Brief in Opposition to Plaintiff's Motion for Preliminary Injunction ("Biffar Decl.").

[7] The compensation committee must be composed of two or more outside directors and must also certify performance before the compensation is paid.  *See* 26 U.S.C. § 162(m)(4)(C).

[8] A copy of Section 1.162-27 of the Treasury Regulations issued by the United States Department of the Treasury, 26 C.F.R. §1.162-27, is attached to the Biffar Decl. as Exhibit A.

7

shareholders have approved the material terms of a performance goal, no additional disclosure or approval is required unless the compensation committee changes the material terms of a shareholder-approved performance goal.  Additionally, if the compensation committee retains authority to change the targets under a shareholder-approved performance goal, shareholders must re-approve the material terms of the performance goal no later than the first shareholder meeting that occurs in the fifth year following the year in which the shareholders previously approved the performance goal.  Treas. Reg. § 1.162-27(e)(4)(vi); 26 C.F.R. § 1.162-27(e)(4)(vi).

Finally, for purposes of Section 162(m), a stock option is deemed to constitute performance-based compensation if: (i) the option is granted by a corporation's compensation committee; (ii) the plan under which the option is granted states the maximum number of options that may be granted during a specified period to any employee; and (iii) the amount of compensation that the employee will receive under the option is based solely on an increase in the value of stock after the date of grant.  Treas. Reg. § 1.162-27(e)(2)(vi); 26 C.F.R. § 1.162-27(e)(2)(vi).

To comply with the foregoing guidance, Avanir submitted the 2005 Plan to its shareholders in its 2005 Proxy and the proposal included terms designed to allow the company to grant stock options that are deductible under Section 162(m). *See* Ocampo Decl., Ex. D [2005 Proxy] at 10 ("The 2005 Plan has been structured so that any compensation deemed paid in connection with the exercise of option grants made under that plan will qualify as performance-based compensation that *will not be subject to the $1 million limitation*.") (emphasis added).  Avanir amended the 2005 Plan in 2006 to increase the number of stock awards and restricted stock units that it may grant under the plan and submitted the amendment for shareholder approval. *Id.*, Ex. E at 7.  Nothing in the 2006 Plan amendment impacted the shareholder-approved terms under which Avanir may grant stock

8

options under the 2005 Plan, and Avanir has not subsequently adopted any material amendments to the 2005 Plan.[9] *Id.* ¶ 13.

Based on governing tax guidance following shareholder approval of the 2005 Plan, absent (i) a change to the material terms under which stock options may be granted under the plan or (ii) discretion by the Board's Compensation Committee (the "Committee") to change the performance goals under a stock option, *no further shareholder approval is required* for the Committee to continue granting stock options under the 2005 Plan during the entire term of the plan.  Neither of these factors apply with respect to options granted under the 2005 Plan. First, there has been no change to the material terms approved by shareholders under which stock options may be granted under the plan.  Second, the Committee does not retain discretion to change the performance goals with respect to option grants, because stock options granted under the plan increase in value only if Avanir's share price increases in value.  Declaration of Jesus Varela in Support of Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction ("Varela Decl."), filed herewith, ¶ 3.  In short, the Committee may continue granting stock options to Avanir's covered executives under the 2005 Plan and compensation associated with those stock options may qualify for deduction under Section 162(m).

As the Proxy notes, as of December 13, 2013, there remained 191,126 shares available for issuance under the 2005 Plan, which is set to expire by its terms in 2015.[10]  Avanir does not currently maintain any other equity incentive plan.  2014 Proxy at 12.  Given the low share reserve remaining under the company's current equity incentive plan and the short term remaining for that plan, shareholder

---

[9] Avanir amended the 2005 Plan in 2009 to reflect the company's change in reincorporation from California to Delaware.  The amendment did not impact any of the substantive terms under the 2005 Plan. Ocampo Decl. ¶¶ 12-13.

[10] 2014 Proxy at 12-13.  If the 2014 Plan is not approved, the 2005 Plan's share reserve would increase at the beginning of Avanir's 2015 fiscal year by a maximum of 325,000 shares under the annual evergreen provision (an automatic annual increase in the share reserve under the plan), which is disclosed to shareholders. *See id.* at 12.  Avanir committed not to utilize this evergreen share increase if its shareholders approve the 2014 Plan.  *Id.* at 13.

9

1   approval of the 2014 Plan is necessary for the company to continue granting tax-

2   deductible equity awards to its covered executives in the future.[11]  For this reason,

3   the Proxy is neither misleading nor inaccurate when it states that "stockholder

4   approval of the 2014 Plan would preserve our ability to grant a range of tax-

5   efficient stock-based incentive awards under the 2014 Plan." *Id.* at 13.

6        Plaintiff's various allegations regarding the Proxy's supposed failures to

7   disclose tax deductibility of compensation paid to covered executives and the tax

8   liabilities associated with the company's alleged "failure" to comply with Section

9   162(m) are similarly inaccurate.  For example, Avanir's 2012, 2013, and 2014

10  proxy statements clearly state that "no covered executive's compensation for

11  Section 162(m) purposes exceeded $1.0 million" for each of fiscal years 2011,

12  2012, and 2013 (*i.e.*, the years at issue in the complaint).  Ocampo Decl., Exs. F

13  [2012 Proxy at 30]; G [2013 Proxy at 32]; H [ 2014 Proxy at 41].

14       An even more fundamental issue, and one entirely ignored by plaintiff, is that

15  Avanir is currently unable to use federal tax deductions with respect to its equity

16  awards granted to *any employee* because of its significant net operating losses.  *Id.* ¶

17  28.  Avanir's most recent Form 10-K disclosed significant net operating losses,

18  including a federal net operating loss carry-forward of $407.4 million as of

19  September 30, 2013.  *See* Ocampo Decl., Ex. I [FY 2013 Form 10-K, at F-33].  The

20  Form 10-K further noted that "[s]ince the Company has a net operating loss carry-

21  forward as of September 30, 2013, 2012, and 2011, no excess tax benefits for tax

22  deductions related to share-based awards were recognized in the accompanying

23  consolidated statements of operations." *Id.* at F-16.  Put another way, the company

24  is unable to utilize tax deductions related to *any* of its share-based awards because

25  _____

26  [11] The 2014 Plan will expand the types of tax-deductible equity awards that the
    Compensation Committee may grant to covered executives to include stock awards
27  (restricted stock and restricted stock units) and cash-based awards.  2014 Proxy at
    14 (setting forth annual limits for purposes of Section 162(m)).  Under the 2005
28  Plan, the Compensation Committee may currently grant tax- deductible stock
    options to covered executives.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION

of the company's net operating losses. *Id.* ¶ 28.

Notwithstanding these clear disclosures regarding the tax status of Avanir's equity award grants, plaintiff insinuates that the company's compensation-related disclosures, including is Compensation Discussion & Analysis ("CD&A") in the Proxy,[12] obfuscate the source of awards granted to covered executives to hide the fact that the awards are not deductible under Section 162(m). The insinuation is inaccurate and plaintiff's underlying point is irrelevant. The covered executives' Forms 4 filed with respect to equity grants they received after Avanir's February 2011 annual meeting (*i.e.*, the meeting in which plaintiff alleges that Section 162(m) performance goals should have been reapproved) were made under the company's 2003 Equity Incentive Plan (the "2003 Plan"), which expired by its terms in March 2013. 2014 Proxy at 12. The 2003 Plan was not (and did not need to be) approved by Avanir's shareholders[13] and awards granted to covered executives under the plan are therefore not deductible under Section 162(m). Avanir has never represented to its shareholders that awards granted under the 2003 Plan are deductible under 162(m) (Ocampo Decl. ¶ 5) and, in any event, the deductibility of any such awards is irrelevant because the company is currently unable to utilize tax deductions for any of its share-based compensation.[14] *Id.* ¶ 28.

_____

[12] The purpose of the CD&A compensation tables is to inform shareholders of the *amount* of compensation paid to a company's named executive officers during each fiscal year. Plaintiff fails to explain why a disclosure that is required every year and is unrelated to Proposal 4 should include information that Plaintiff alleges should appear in Proposal 4.

[13] The company adopted the 2003 Plan prior to the Nasdaq listing requirements that now require shareholder approval. *See, e.g.*, SEC Release No. 34-48108 (June 30, 2003) (setting forth the rules for shareholder approval of equity plans).

[14] Even if Avanir were able to use tax deductions for its equity grants under the 2003 Plan, it is under no legal obligation to do so. *Freedman*, 2012 Del. Ch. LEXIS 74, at *44-45. In light of the underlying facts, plaintiff's claim that Avanir failed to disclose why it failed to seek shareholder re-approval of the 2005 Plan at its 2011, 2012, or 2013 annual meetings (*e.g.*, to permit the Committee to grant non-option equity awards to covered executives that would be deductible under Section 162(m)) is easily addressed. The Committee did not grant any non-option equity awards to its covered executives under the 2005 Plan following the company's 2011 annual meeting and, more fundamentally, the company could not

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1

**2.     Plaintiff Fails to Establish That Any of the Details He Wants to Disclose Are Material.**

2

3      Materiality is measured objectively:  "An omitted fact is material if there is a

4  substantial likelihood that a reasonable shareholder would consider it important in

5  deciding how to vote ….  Put another way, there must be a substantial likelihood

6  that the disclosure of the omitted fact would have been viewed by the reasonable

7  investor as having significantly altered the 'total mix' of information made

8  available."  *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 48 L. Ed. 2d

9  757, 96 S. Ct. 2126, 2132 (1976).  This standard applies to Rule 14a-9 claims (*id.*)

10  and those involving the duty of disclosure under state law (*see Pfeffer v. Redstone*,

11  965 A.2d 676, 686 (Del. 2009)).

12      More disclosure is not tautologically better disclosure.  The law does not

13  require companies to bury shareholders in "an avalanche of trivial information,"

14  because doing so is "hardly conducive to informed decision making."  *TSC Indus.,*

15  426 U.S. at 448-49.  The law does not require that "all available information" be

16  provided.  *In re Siliconix Inc., S'holders Litig.*, Civ. A. No. 18700, 2001 Del. Ch.

17  LEXIS 83, at *36 (Del. Ch. June 19, 2001) (citation omitted).  As the court in

18  *Clorox* recently observed, a finding that material information was withheld based

19  merely on the notion that the omitted information would have been helpful "would

20  be a license to file suit where *anything* was withheld, for any information can

21  always be labeled as potentially 'helpful,'" but "Delaware law provides no such

22  license."  *Mancuso v. Clorox Co.*, No. RG12-651653 (Cal. Super. Ct. Aug. 21,

23

24

_____

(continued…)

25      have utilized any tax deductions for its share-based compensation paid during those years even if it had sought shareholder approval for purposes of Section

26  162(m).  Ocampo Decl. ¶¶ 14, 26.  Plaintiff fails to explain why the company is obligated to explain to its shareholders in the Proxy why it opted not to devote

27  valuable resources to seek shareholder approval for theoretical tax deductions. Indeed, Avanir has spent more money defending against plaintiff's specious claims

28  than the aggregate amount of tax deductions that it has lost under Section 162(m) with respect to equity awards granted under the 2005 Plan: $0.  *Id.* at ¶ 27.

12

2013) (Statement of Decision (Tentative)), at *17 ("*Clorox* Decision"); *see also Mancuso v. Clorox Co.*, No. RG12-651653 (Cal. Super. Ct. Sept. 24, 2013) (Notice of Entry of Judgment in Favor of Defendants).[15]  Rather, plaintiff must demonstrate that the omitted information would have assumed actual significance in the deliberations of the reasonable stockholder.  *See Strategic Diversity, Inc. v. Alchemix Corp.*, 666 F.3d 1197, 1207 (9th Cir. 2012).

Plaintiff nowhere attempts to establish materiality under this standard.  Instead, he reflexively declares that, if analyses were presented to the Board, the information is material and a summary must be disclosed.  This inaccurate axiom "is certainly not the law." *Wayne Cnty. Emps.' Ret. Sys. v. Corti*, 954 A.2d 319, 332 (Del. Ch. 2008).  As the Delaware Court of Chancery has explained, "[N]ot every document reviewed by the board is material . . . .  'Otherwise every book that's given to the board and every presentation made to the board would have to be part of the proxy . . . .'" *Id.* (citation omitted).  Further, the summary provided need not include every detail, the disclosure of which may only prove to be misleading rather than enlightening.  *See TSC*, 426 U.S. at 448-49.  Nor does the law require a company to disclose detailed information sufficient to enable shareholders to replicate the analysis performed by the company's outside consultants. *See, e.g., Dias v. Purches*, Civ. A. No. 7199VCG, 2012 WL 4503174, at *9 (Del. Ch. Oct. 1, 2012) (proxy need not disclose "underlying financial data that would allow the Plaintiff to make its own independent judgment as to the advisability of the merger").  Simply put, plaintiff's demand for more disclosure amounts to "nothing more than an example of the 'tell me more' variety of disclosure claims" that routinely fail. *Freedman,* 2012 Del. Ch. LEXIS 74, at *77.[16]

_____

[15] Copies of the Clorox Decision and the Clorox Notice of Entry of Judgment in Favor of Defendants are attached as Exhibits C and D to the Biffar Decl.

[16] Professor Daines explains why this limitation is sensible as a practical matter: "[T]he net value of a stock incentive plan … involves complicated cost-benefit analysis and cannot properly be evaluated without specialized skill and

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION

In any event, the Proxy does contain a thorough summary.  The Proxy explains that the Committee retained an outside consultant, Radford, an Aon Hewitt Company ("Radford"), to help design a new compensation plan.  2014 Proxy at 30. The Committee identified its peers in the market and analyzed other compensation data that Radford provided.  As disclosed in the Proxy, the Committee ultimately reached the determination that "the availability of 17,000,000 shares would provide a sufficient additional number of shares to enable the Company to continue to make awards at historical average annual rates for the next four years." *Id.* at 13. Nothing more is required.  The Proxy need not spell out the precise mathematical calculations that Radford and the Committee employed in connection with arriving at the 17 million figure.  Including more detail for the sake of detail, rather than adding clarity, actually would have the opposite effect by burying shareholders in "avalanche of information" that would not be "conducive to informed decisionmaking." *TSC Indus.*, 426 U.S. at 448-49*; see also Skeen v. Jo-Ann Stores, Inc.*, Civ. A. No. 16836, 1999 Del. Ch. LEXIS 193, at *13-14 (Del. Ch. Sept. 27, 1999) (citation omitted), *aff'd*, 750 A.2d 1170 (Del. 2000).  Courts "must 'guard against the fallacy that increasingly detailed disclosure is always material and beneficial.'" *Abrons v. Maree*, 911 A.2d 805, 813 (Del. Ch. 2006) (citation omitted).

SEC Chair, Mary Jo White, speaking in her personal capacity at a speech on October 15, 2013, explained that while disclosure is generally a good thing, when it "gets to be 'too much' or strays from its core purpose, it could lead to what some have called 'information overload'—a phenomenon in which ever-increasing amounts of disclosure make it difficult for an investor to wade through the volume

---

(continued…)

access to detailed (and often confidential) information about employee compensation that shareholders do not possess.  It would be impractical to share with shareholders all the knowledge and data necessary to complete this analysis." Daines Decl. ¶ 55.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

of information she receives to ferret out the information that is most relevant."[17]
Ms. White singled out disclosures on executive compensation as a particular
concern.  *Id.*  She observed that, "companies have decided to more fully explain to
their shareholders the rationale and considerations for these compensation
decisions.   And we think these additional disclosures are a good thing, but we
should be careful not to have too much of a good thing."  *Id.*

### 3. Much of the Information Sought By Plaintiff is Already Disclosed in the Proxy or in the Public Domain

Companies are not required to disclose facts that are "known or reasonably
available to the stockholder."  *Meyer v. Alco Health Servs. Corp.*, Civ. A. No.
11213, 1991 Del. Ch. LEXIS 10, at *10 (Del. Ch. Jan. 17, 1991); *see also In re
Micromet, Inc. S'holders Litig.*, Civ. A. No. 7197-VCP, 2012 Del. Ch. LEXIS 41,
at *36-37 (Del. Ch. Feb. 29, 2012) (no duty to disclose where "any investor who
desired to know . . . could find this information in [the Company's] publicly-filed
Form 13F").  It necessarily follows that when information is "obvious to anyone
conversant with elementary mathematics," there is no duty under the federal
securities laws to disclose it.  *Data Probe Acquisition Corp. v. Datatab, Inc.*, 722
F.2d 1, 5 (2d Cir. 1983).  Because such information is publicly available, it cannot
be said to alter the "total mix of information already available."  *In re Gen. Motors
(Hughes) S'holder Litig.*, Civ. A. No. 20269, 2005 Del. Ch. LEXIS 65, at *68 (Del.
Ch. May 4, 2005), *aff'd*, 897 A.2d 162 (Del. 2006).  In other words, a shareholder
cannot act like an "ostrich, hiding her head in the sand from relevant information . .
. ."  *Greenhouse v. MCG Capital Grp.*, 392 F.3d 650, 656-57 (4th Cir. 2004).

### (a) Shareholder Dilution

---

[17] Mary Jo White, Chairwoman, SEC, Remarks at Nat'l Ass'n of Corp.
Directors Leadership Conference 2013: The Path Forward on Disclosure  (Oct. 13,
2013), (available at http://www.sec.gov/News/Speech/Detail/Speech/
1370539878806).

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION

Plaintiff complains that the Proxy does not adequately explain the dilutive impact[18] that purportedly will result if Proposal 4 is approved and all of the shares authorized under the 2014 Plan are issued. Pl. Mem. at 7-8, 15. Plaintiff is wrong. The Proxy expressly states that a maximum of 17 million of shares of stock may be issued under the 2014 Plan, which would be 11.2% of the stock outstanding (*i.e.*, the dilution that would be represented by equity awards granted under the proposed plan). 2014 Proxy at 13; s*ee also* Daines Decl. ¶¶ 18, 21.

### (b)  "Overhang"

Plaintiff claims that Avanir should disclose more fully the "overhang," which refers to the amount of potential dilution in the value of currently held shares that could result from future issuance of reserved shares. Pl. Mem. at 7-8. However, shareholders can readily calculate "overhang" based on numbers that Avanir has already disclosed. For example, page 13 of the Proxy states that as of December 13, 2013, Avanir had 12,482,398 shares subject to outstanding awards. The Proxy also discloses the total outstanding shares as 152,111,721. 2014 Proxy at 1. Accordingly, current overhang—shares subject to outstanding awards (12,482,398) divided by total shares outstanding (152,111,721)—is 8.2%. This is a matter of simple math. *See also* Daines Decl. ¶¶ 19, 21.

### (c)  "Burn Rate"

Plaintiff also alleges that Avanir does not disclose its "burn rate." Again, such information easily can be calculated. "Burn rate" is a measure of the speed at which a company uses (or "burns") shares available for grant under its equity compensation plans. Pl. Mem. at 7-8. It is unclear whether plaintiff believes that Avanir should have disclosed its historical burn rate or projected the expected burn

---

[18] As Professor Daines makes clear (Daines Decl. ¶¶ 43-48), there are several possible meanings of the phrase "dilutive impact," and plaintiff has not made clear what he means by the term. For purposes of this brief, defendants assume that plaintiff is referring to the impact on the value of any single share of Avanir stock that may be caused by the issuance of additional shares under equity compensation plans.

16

1    rate under the 2014 Plan.  A claim does not arise under either definition.

2         Avanir's burn rate for the past three years easily can be derived from

3    information that Avanir has disclosed in the Proxy and its most recent Form 10-K.

4    By dividing the total number of shares subject to equity awards granted during a

5    fiscal year (2014 Proxy at 13) by the weighted average number of  shares

6    outstanding during the fiscal year (FY 2013 Form 10-K at 34), one can calculate

7    simple burn rates for fiscal years 2011, 2012, and 2013 as 2.51%, 2.63%, and

8    2.18%, respectively.  *See also* Daines Decl. ¶¶ 20-22 tbl. 1.  The securities laws do

9    not require companies to disclose every possible metric or statistic that could be

10   easily calculated from the raw data the company has supplied to the investing

11   public.  *See Data Probe*, 722 F.2d at 5 (finding no duty under federal securities law

12   to disclose information "obvious to anyone conversant with elementary

13   mathematics").

14        As for the company's future burn rate, this would be pure speculation, as the

15   Committee retains discretion over what awards to make.  2014 Proxy at 13 ("The

16   2014 Plan is administered by our Compensation Committee, who has the authority

17   to, among other things, . . . determine eligibility for, grant and determine the terms

18   of awards under the 2014 Plan . . . .").  Nor is Avanir required to disclose

19   projections the company or its consultants may have developed to estimate the

20   amount of stock that might be awarded.  Given the discretionary nature of the 2014

21   Plan, any projection might prove misleading rather than enlightening.  *See, e.g.,*

22   *Gordon v. Symantec*, No. 1-12-CV-231541, 2013 WL 657791 (Cal. Super. Ct. Jan.

23   22, 2013); *Mancuso v. Clorox Co.*, No. RG12-65163, 2012 WL 5874640, at *1

24   (Cal. Super. Ct. Nov. 13, 2012) (refusing to enjoin shareholder vote on

25   compensation plan where plaintiff failed to show materiality of information omitted

26   from proxy); *In re Checkfree Corp. S'holder Litig.*, Civ. A. No. 3193-CC, 2007

27   Del. Ch. LEXIS 148, at *11 (Del. Ch. Nov. 1, 2007).

28

### (d)    Criteria for Issuing Stock Appreciation Rights and Restricted Stock Units

Plaintiff alleges that the Proxy omits the criteria the Committee relied upon when issuing stock appreciation rights or restricted stock.  Pl. Mem. at 8, 15.  It is difficult to discern what plaintiff is alleging here, as the company has not made any such grants under the 2014 Plan.  Presumably this claim refers to the contingent restricted stock units (RSUs) granted to covered executives under the 2014 Plan in December 2013 and disclosed to shareholders in the Proxy.  2014 Proxy at 18.  Plaintiff does not cite to any authority that would require Avanir to disclose the criteria it considered in granting individual equity awards.  Assuming plaintiff's allegation relates to prospective grants that the company may make under the plan, as the Proxy makes clear, the Committee retains discretion to determine the applicable terms.  2014 Proxy at 14.

### 4.    Plaintiff's Additional Metrics

Drilling deeper, plaintiff argues that even greater detail should be provided in the form of additional information regarding certain figures that can be discerned from information that is already publicly available.  Plaintiff's arguments for mandatory disclosure of each of these items make little sense.

### (a)    "Burn Rate" Comparison

Plaintiff argues that with respect to Avanir's burn rate, the Proxy must disclose that Avanir's three year average burn rate is 2.74% as compared to the Industry Mean of 3.84% and the ISS Burn Rate Limit of 6.70%.  Plaintiff's Supplement in Support of Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction ("Pl. Supp. Mem."), Dkt. No. 16, Jan. 30, 2014, at 4.  Ironically, this comparison makes Avanir's 2014 Plan look even more favorable (not less), in that the burn rate is below (not above) these two benchmarks.  It certainly would not cause shareholders to question the 2014 Plan, nor would it substantively alter the "total mix" of information available to them.

### (b)   Testing of CEO Pay-for-Performance Relative to Returns

Plaintiff claims Avanir must disclose ISS's testing of CEO Pay-for-Performance relative to the Company's 1-year and 3-year shareholder returns.  *Id.*  As noted in the Radford materials, ISS may recommend a "no" vote for a company's equity plan proposal if ISS determines that the company's level of pay to its CEO is misaligned.  Declaration of David E. Bower in Support of Plaintiff's Motion for a Preliminary Injunction ("Bower Decl."), Dkt. No. 16-1, Jan. 30, 2014, Ex. B at 3, 7.  In so arguing, plaintiff misses the most important point:  Radford concluded that Avanir would likely pass ISS's test with a "low" level of concern and ISS actually has supported the 2014 Plan.  *Id.*

### (c)   Shareholder Value Transfer Analysis

Plaintiff argues that Avanir must disclose Radford's shareholder value transfer (SVT) analysis showing the share value with overhang.  As a threshold matter, Radford calculated this information using ISS's proprietary SVT modeling tool.  *Id.* at 1.  Even assuming that Avanir could disclose ISS's proprietary information, this is purely an internal proprietary ISS metric that the proxy advisory firm uses for its own purposes.  That is the very type of minutiae that is *subject to change* and *not* required to be disclosed.  *See, e.g., Ryan v. Lyondell Chem. Co.*, No. 3176-VCN, 2008 WL 2923427, at *19 n.115 (Del. Ch. July 29, 2008), *rev'd on other grounds*, 970 A.2d 235 (Del. 2009); *Solomon v. Armstrong*, 747 A.2d 1098, 1130 (Del. Ch. 1999).

### 5.   Professor Daines Explains Why the Details Plaintiff Seeks Are Immaterial

In contrast to the absence of expert testimony from the plaintiff, Avanir has submitted a comprehensive declaration by Professor Daines of Stanford Law School.  Professor Daines, whom the SEC has retained as an expert on the materiality of public disclosures, opines that the disclosures plaintiff seeks here are

19

not material to a reasonable shareholder.  He shows that none of the information that plaintiff claims is missing from the Proxy would be material to a reasonable shareholder in deciding how to vote on Proposal 4.  Daines Decl. ¶¶ 11-12, 14-16, 24-31.  Professor Daines's analysis is based on a thorough empirical analysis of the proxy disclosures of many companies similar to Avanir that have recently shareholder approval for new stock option plans.

Professor Daines first notes that "[a] set of practices, customs or standards have emerged about how much detail is appropriate in an annual proxy," and that these customs reflect a "collective professional judgment … about the kind of information that is valuable to investors." *Id.* ¶ 24.  Economic theory dictates that companies will disclose important information because if they do not, they may find it hard to raise money. *Id.* As a result, "one good way to tell whether additional details are actually important is to see whether or not they are included in a significant number of proxies for similar companies.  If not, this reflects a collective judgment that these details are not important." *Id.* ¶ 25.

Professor Daines systematically compared the disclosures in the Avanir Proxy to the proxy disclosures of twenty-five companies that are similar in size to Avanir and have requested shareholder approval of an equity incentive plan. *Id.* ¶¶ 26-28, tbls. 2-3.  He found that most of the peer companies did not disclose the kind of information that plaintiff seeks here and *not one* of the peer companies disclosed all of the information plaintiff seeks. *Id.* ¶ 29 tbl. 3.  In fact, Avanir's disclosures were consistent with disclosures made by similar companies in the areas about which plaintiff complains. *Id.* ¶ 29.  Specifically, no other peer company disclosed more than Avanir about expected overhang, only 28% disclosed more about burn rate, and only 12% disclosed more about the criteria for awarding future grants. *Id.* ¶ 29 tbl. 3.  With respect to plaintiff's claim that Avanir should disclose a summary of a burn rate and overhang analysis performed by an outside consultant (Pl. Supp. Mem. at 3-4), Professor Daines found that *only one of the twenty-five peer*

20

1    *companies disclosed such a summary.  Id.*

2          From these facts, Professor Daines concludes that "[i]ndustry standard and

3    practice reflect a judgment that the requested information about the 2014 Plan is not

4    important to shareholders," because if it were important, the industry practice

5    would be to disclose such information.  *Id.* ¶ 30.

6          Professor Daines's analysis is supported by the actions of two groups of

7    independent actors—proxy advisory firms and securities analysts—who make a

8    living by examining thousands of corporate disclosures in general and proxy

9    materials in particular, in order to advise investors.  As Professor Daines notes, (*id.*

10   ¶¶ 35-36; Biffar Decl., Exs. H-I), two of the country's leading proxy advisory firms,

11   ISS and Glass Lewis,[19] analyzed Avanir's Proxy and issued reports recommending

12   that shareholders vote in favor of Proposal 4.  These firms often favor broader

13   voluntary disclosure than the securities law require (Daines Decl. ¶ 35), and their

14   approval is therefore notable.  In its analysis, Glass Lewis states, "we find no

15   significant reason for shareholder concern regarding the material terms of the

16   proposed plan."  Biffar Decl., Ex. I at 15; *see also* Daines Decl. ¶ 36.  Similarly,

17   ISS noted that a vote for Proposal 4 is warranted, in part because "[t]he shareholder

18   value transfer appears to be within a reasonable range," and "[t]he equity burn rate

19   is reasonable."  Biffar Decl., Ex. H at 17; *see also* Daines Decl. ¶ 36.

20         Professor Daines also reviewed the reports of each of the three securities

21   analyst firms that covered Avanir during the time that the Proxy was published.

22   Professor Daines concluded that *not a single analyst* called for the disclosures

23   ─────────────────────

24   [19] ISS maintains an experienced research team of analysts and data professionals
     that provide comprehensive proxy analyses and complete vote recommendations for

25   more than 40,000 meetings in over 100 markets worldwide.  Institutional
     Shareholder Services, http://www.issgovernance.com/proxy/advisory (last visited

26   Feb. 5, 2014).  Similarly, Glass Lewis is the leading independent governance
     analysis and proxy voting firm and serves institutional investors globally that

27   collectively manage more than $15 trillion in assets.  Glass Lewis & Co.,
     http://www.glasslewis.com/about-glass-lewis/ (last visited Feb 5. 2014).  True and

28   correct copies of the reports and recommendations of ISS and Glass Lewis
     regarding Avanir's 2014 Proxy are attached to the Biffar Decl. as Exhibits H and I.

plaintiff seeks here or even discussed the allegedly necessary information.  Daines Decl. ¶¶ 32-34.  Importantly, no proxy advisory firm, securities analyst, or anyone else has publicly recommended voting against Proposal 4, and no one other than plaintiff has suggested that Avanir's Proxy disclosures are lacking in any respect.

### 6.   Courts Have Consistently Refused to Require  Additional Disclosures Relating to Compensation Plans

Courts overwhelmingly have rejected the need for the type of disclosures that plaintiff seeks here.  An injunction here only would serve to heighten the uncertainty that companies face in deciding what information to disclose regarding incentive compensation.

Plaintiff's attorneys have filed approximately twenty-two cases seeking to enjoin shareholder votes on issues relating to compensation or equity plans, according to publicly available litigation resources.  *See* Cases, Faruqi & Faruqi LLP, http://www.faruqilaw.com/cases/allCases (last visited Feb. 5, 2014).  After one early plaintiff's victory, *Knee v. Brocade Commc'ns Sys. Inc.,* Case No. 1-12-CV-220249 (Cal. Super. Ct. Apr. 10, 2012),[20] and several settlements prior to a court ruling on the plaintiff's preliminary injunction motion, courts in California and elsewhere have refused to enjoin shareholder votes on matters relating to compensation or equity plans.  *See Clorox*, 2012 WL 5874640; *Symantec,* 2013 657791; *Morrison v. Hain Celestial Grp.,* No. 602074/2012 (N.Y. Super. Ct. Nov. 14, 2012); Transcript of Hearing on Motion for TRO, *Noble v. AAR Corp.*, No. 1:12-CV-07973 (N.D. Ill. Oct. 9, 2012);  *Rice v. Ultratech*, No. 1-12-CV-226520 (Cal. Super. Ct. Jul. 16, 2012).[21]

The reasoning in *Brocade*, on which plaintiff so heavily relies, does not apply.  In *Brocade*, the plaintiff sought disclosure of specific projections the board

---

[20] A copy of the *Brocade* decision can be found at Exhibit C to the Declaration of David E. Bower filed on January 20, 2014 (Dkt. No. 16-2).

[21] To the extent a written order was issued, copies of the unpublished decisions referenced are attached as Exhibits E – G to the Biffar Decl.

22

relied on when it decided to seek approval for 35 million shares.  The court only
held that shareholders are entitled to "generally understand" these projections and
how and why the board came to its numbers.  Bower Decl., Ex. C at 100.  By
contrast, Avanir's Proxy does contain a projection that lets shareholders "generally
understand" how the Board arrived at its numbers.  The Avanir Proxy states that in
fiscal 2011, 2012, and 2013, the Company made equity awards under its existing
equity incentive plans totaling approximately 2,993,888 shares, 3,501,642 shares,
and 3,095,910 shares, respectively.  2014 Proxy at 13.  The Avanir Proxy also
states that, as of December 13, 2013, Avanir had only 191,126 shares available for
future awards.  *Id*.  Finally, the Avanir Proxy states that "the availability of
17,000,000 shares would provide a sufficient additional number of shares to enable
the Company to continue to make awards at historical average annual rates for the
next four years."  *Id*.  Thus, the Proxy already provides exactly what the *Brocade*
court held that Brocade's Proxy should have disclosed: an explanation of how and
why the Board arrived at its number of proposed additional shares.   It is difficult to
imagine (and plaintiff does not explain) how disclosing still more information
would plausibly take on "actual significance" in the mind of a reasonable
stockholder or significantly alter the "total mix" of information.

The recent *Clorox* decision illustrates the trend of courts refusing to broaden
the scope of the types of information companies are required to disclose related to
incentive compensation plans.  After denying the plaintiff's motion for preliminary
injunction to enjoin the shareholder vote, the court held that the company did not
omit any material information, and made specific findings with respect to the
information Plaintiff sought to disclose.  *Clorox* Decision at 8-17.  Similar to
plaintiff's claims here, the plaintiff argued that Clorox was required to disclose a
summary of a number of reports and analyses given to and considered by Clorox's
compensation committee.  *Id*. at 2, 8-16.  With respect to each piece of information,
the court rejected the plaintiff's argument, finding that such information (which

23

included peer group, CEO Pay-for-Performance, and fair value transfer analyses) would not significantly alter the total mix of information. *Id*. at 8-16. The court concluded by observing that the plaintiff had "simply discovered what additional information was presented to [Clorox's compensation committee] and not included or summarized completely in the Proxy and then described why such information would be 'helpful.'" *Id*. at 17. That is exactly what plaintiff has done.

## D.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN DEFENDANT'S FAVOR

Plaintiff would not suffer any harm if the shareholder vote on Proposal 4 were allowed to proceed. On the other hand, if the Court enjoins the shareholder vote on Proposal 4, Avanir, its shareholders, and other public companies would suffer significant harm. *First,* enjoining the shareholder vote would threaten the availability of shares with which to compensate Avanir employees. As noted above, as of December 13, 2013, there remained 191,126 shares available for issuance under the 2005 Plan. These shares are insufficient to provide the equity component of the company's employee compensation for the foreseeable future, given the company's recent historical burn rates above 3 million shares a year. Moreover, if the company is unable to compensate its employees with equity, it would be forced to reallocate its crucial cash reserves to compensation, which would undermine its goal of reaching profitability.

*Second,* a ruling that a public company must disclose additional detailed information that custom and practice shows shareholders do not value would have far-reaching implications, not only for Avanir but for all public companies and their shareholders. As Professor Daines explains, there is a cost to additional disclosures, and a new requirement for detailed information would also introduce uncertainty about the need to disclose a broad range of additional information about many company-wide decisions. Daines Decl. ¶ 53. Allowing the vote to proceed will communicate to companies such as Avanir that courts will honor directors'

good faith business judgments and protect them against predatory lawsuits, whereas granting an injunction will leave companies at the mercy of a single shareholder who wishes to replace the board's decisionmaking with his own.

*Third,* the company would incur significant unnecessary expenses if it were required to schedule a new shareholder meeting, issue an amended proxy, and hold another vote on Proposal 4.  *See* Ocampo Decl. ¶¶ 41-48.  In addition to the "hard" costs involved, a tremendous amount of time would be expended by directors and officers that could better be directed at company business.

## IV.   BOND REQUIREMENT

Rule 65(c) of the Federal Rules of Civil Procedure provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper," and that it may be reversible error to issue an injunction without such security.  *Hoechst Diafoil Co. v. Nan Ya Plastics Corp*., 174 F.3d 411, 421 (4th Cir. 1999).  As detailed in the Declaration of Christine G. Ocampo, filed concurrently herewith, the injunctive relief plaintiff seeks will result in financial and practical harm to Avanir.  Ocampo Decl. ¶¶ 41-48.  Thus, if the Court were to issue such an injunction, a bond of no less than $137, 205.86 should be required.

## V.   CONCLUSION

Plaintiff's motion for a preliminary injunction should be denied.

Dated:  February 5, 2014                      Respectfully submitted,

                                             JONES DAY


                                             By:/s/ *Travis Biffar*
                                                Travis Biffar

                                             Attorneys for defendants